SIRF Technology v. International Trade Commission Welcome. Please proceed. Good morning, and may it please the Court. There are a number of patents in this case, a number of issues, and a limited amount of time. So what I propose to do is to start with these two issues. First, the divided infringement and extraterritoriality issues regarding the 651 and 000 patents. And second, the construction of the term long-term satellite tracking data. If there's time, I'll address some of the other issues and respond to any of the Court's other questions. With regard to the 651 and 000 patents, the International Trade Commission's error can be seen at page A16 of the ITC's opinion. It says, SIRF allows these customer distribution servers, and those servers, by the way, are operated by SIRF's customers. And the important word there is allows. It doesn't direct or control, but allows those servers to download extended ephemeris data from the SIRF Instant Fix server on a daily basis, and these distribution servers, again, customer-operated, then forward the downloaded extended ephemeris data to the GPS receivers of end users upon request. What that latter part shows is that the customers are the ones who are making the election to request the data. This is not a situation where SIRF is the mastermind of infringement. The final consumer. I'm sorry? You used the word customer. You mean the final consumer. Yes, that's right, the final consumer. There are two customers. There's the middleman, and then there's the middleman. Judge Clevenger, I have the same confusion, and I apologize for the confusing terminology. The end user is the person like me with the GPS instrument in my car. And, Judge Clevenger, if you would like record citations for that latter point, the fact that the customers have to actually take out their instrument from their car, if it's a car unit, hook it up to the Internet and sync it. You'll find that, among other places, at page 8770. That's the testimony of Global Locate's expert. They have to turn it on. I'm sorry? They have to turn it on. Well, they don't just have to turn it on. They have to turn it on, hook it up to the Internet, and request this data specifically. And then, again, it also has to be enabled by the SIRF customer, which is the maker that has the server that is serving the end unit. The point of all this being precisely what? The point of all of this is that under the controlling principles of BMC and MuniAuction, SIRF did not direct or control these method steps. And because SIRF did not control or direct. You're interpreting direct and control to mean no one else does anything, everybody else is just passive? I'm not sure that's necessarily the case. But here, this is not a case where there's a contractual relationship. It's undisputed what the user does, and it's undisputed what the middleman does. But I don't see that that necessarily negates control or direction. I think this court in MuniAuction, Chief Judge Michel, said that the direction or control standard is effectively where the law would impose a respondeat superior type obligation. And that's clearly not the relationship between SIRF and the end users, certainly. In fact, keep in mind that each of these claims require the 651 GPS receiver and the 000 remote receivers. MuniAuction didn't say that's the only test, right? I'm sorry? MuniAuction said we see this as a similar situation as the respondeat superior. They didn't limit, didn't say there can never be direction or control without that test being met. I think if that's the case, Judge Clevenger, then I think it does describe the mine run of cases. And I'm having a hard time seeing how SIRF, under any principle of agency, under any principle of tort law, is responsible for the voluntary elective actions of not only the customers... The only elective act in the whole system, which it's assumed for the moment, was the consumer flicking an on switch. A little bit of a harder case. How much harder? Again, if we're talking about the same instrumentation and we're just changing the facts where all the consumer had to do... Aren't we talking under the developing case law? We only got two or three cases here. We're talking about developing case law. We're talking about what's the relative? What's the feel? It's clear that no one person is performing all steps. The claim is written in such a way that it can't be. Well, if that's the case, then that, I think, as BMC suggested, is a claim drafting problem. No, that's a wrong direction issue. If you can write a claim very easily to say that it's going to require three different players to contribute in order to have the method satisfy, that's easy. What our case law is saying is you can't just write a claim like that that says there's never going to be direct infringement. You need to ask, is there direction or is there control? You say, well, what was going on in many auctions? What was happening? What was it that the auctioneer himself couldn't do? Well, the person had to decide whether they wanted to participate. Same as your case. GPS guy has to decide to turn it on, right? Right. Okay. In many auctions, you had to fire up his computer. Well, then he had to pick a browser because he had to connect up to the auctioneer, right? Then what he had to do was to select a security he wanted to buy, and then what he had to do was to put in a price he wanted to buy it for, right? Now, that's more quantum. If I'm sort of putting it on a scale and weighing it, that's more activity than is required of your end user, your Joe GPS guy, right? But I don't think it's different in kind, Your Honor. That's, I think, what we probably ought to talk about. At least from my perspective, that's what you ought to be talking about. I think that to be responsive to the comparison to Muni Auction, what you have here, and I think you have to back up to the customer server here for a second, because the customer has to make the determination that it's going to provide the data to the end user in the first place. And then assuming that's made in this case, then the end user has to, again, I don't take my GPS unit out of my car and hook it up to my computer. But if I did, then I might decide or decide not to download this data. That's an elective action on their part. The difference here is that this whole system simply cannot operate, period, without the software and the technology that CERF has embedded in its communication to its customer, and then the customer communication to the Joe GPS and what happens there. As an owner of your device, I can't alter. I can't make it work some other way. I'm locked in to what's embedded in the method, if you will, by your client. I totally control how this thing will be used. Not when it's going to be used, but how it's going to be used. I'm not entirely sure, Judge Clevenger, that that's an accurate recitation of the record. I can't cite you chapter and verse on that right now. Well, you're in trouble if you can't, right? But I think the salient fact here is that the customer themselves has to do something. I think the unit is still operable, but I think this Court's decision in cases like ACCO Brands say that manufacturing a device that has the mere capability of doing something isn't enough. And if that's the case, then it certainly must be the case in the divided infringement context where CERF is manufacturing chips. That's all we make, chips and chipsets. We don't make receivers. We don't make the units that go into the cars. In that circumstance, it's got to be something like the ACCO always and inevitably standard, and that's not what you have here. Let me tell you what the problem is. The problem is you're arguing about all these cases and you say, yes, this case said that, the other case said that. It may be that this is a new case, a new issue, and the issue is whether turning it on defeats a finding of direct infringement,  As a matter of patent policy, why shouldn't somebody be able to draft a claim that includes as one of the steps, here's all the available information, and the last step is turning it on, turning the machine on, and that's done by somebody else. Why shouldn't that be patentable? That's really the question. Well, if I'm to respond to that question, I think I need to disabuse you of the notion that all that has to happen here is that the user turns on the unit. That's not the case. Again, if you look at the record, and if you look specifically at 8770 was Mr. Pandy, 7984 is Global Locates Pratt, testifying that the customers don't just have to turn it on, but they have to hook it up, and they have to get an internet connection. That's important because not all of these units have wireless internet connections in them. You may very well have to put it into a wire into your computer to go get this. Who gives the consumer the instructions on how to do that? Is it in your instruction book or in your package? CERF certainly doesn't provide end users with any instructions because, again, we don't make the end units. So what we have here, I think, is on some level. You have no control over what your manufacturer, whoever makes this unit, says? None, and there's nothing in the record that would suggest that, Judge Kloppinger. So where are we supposed to draw the line? That's the question. Assuming that the earlier cases don't answer this particular question, where is the appropriate place to draw the line? I think, Judge Dyke, this case is actually an easier case for drawing the line than Muni Auction or VMC because you have not only one but two intervening actors. You have the CERF customer, which is the maker of the unit, the people who are maintaining the server or the rim in the case of the extraterritorial argument, and then you have the end user. In the end user, both of those people are making elections, and they are elections that are not, again, in the terms of the law, BMC, Muni Auction, they are not directed or controlled in any way by CERF. And so the line I would suggest... That's just the question is whether providing the software and the method and telling their server exactly what to do if it's turned on or what the GPS machine should do when it's turned on, whether that's sufficient to constitute direction and control. I think, Judge Dyke, then you can look to analogous areas of tort law, and you can even use the analogy that is used in the global patent holdings case, the district court case that was later affirmed by this court, where the district court said, yes, you may give them the keys to the vehicle, but you don't require them to start it up and drive it. There is an attenuated causation here under the law, and you wouldn't see that sort of causation recognized in the tort context, and this court has long said that patent infringement is a tort. If I could turn very briefly... That goes a little too far on your causation argument, because you could have a situation where the last step was something of just turning a little dial that makes the thing readable. A little dial you have to turn to go from a blank screen to a clear screen. And in causation, tort causation, if you didn't have that step, you wouldn't have it. I don't think that. Your argument there doesn't help me deal with your response to Judge Dyke in terms of where we draw the line. Perhaps I overspoke with regard to... I realize it's different in this case, but the test we draw here has to deal with another series of cases that are going to come along. I think the test you have to look to is, you already do have at least two points in your jurisprudence, and that being BMC and Muni Auction. And you do have a direct or control standard, which is derived from a long and rich history of tort law, in particular in the Respondeat Superior area. And in this situation, I think you have to ask yourself, if the element of a tort were the same three limitations, or four limitations, depending on which claim we're talking about, would all four of those elements have been attributable to, in this case, Cerf, by simply manufacturing the chip? The answer, I think, is quite clearly no in a case like this. If I can turn very quickly to the related extraterritoriality argument, the argument here is quite simple. The servers that... Well, was the argument made before the commission? I wasn't clear from that. Well, the argument was absolutely made to the commission. You say it was, but you don't provide a site. Where was the argument, the extraterritoriality argument, made before the commission? I can't provide you the site as I stand here, Judge Dyke. I can tell you for certain that it was raised in the petition for review, and in turn the petition for review referenced the place in the record and in the briefing where this issue was raised. Wouldn't it be too late to raise it in the petition for review if it hadn't been raised before the ALJ? It might be, except that I don't believe that we were faced with that argument when we did raise it in the petition for review. Did you make the argument before the AJ? I'm sorry? Did you make the argument before the AJ? That is my recollection. I don't have the site for you as I stand here. If I can find it, I'll come back on rebuttal and answer that. But I do know it was made in the petition for review, and I do know that it was not addressed by the commission, despite our efforts to have the commission address it. And I know that we asked the ALJ to address it as well, now that I stand here and think about it, because that was one of the points of the petition for review, was that the ALJ failed to address the argument. How restricted are we by these bans that read across all the briefs confidential? Because what we're talking about right now is where the location of the servers were, and all the information in the briefs on that point are bracketed. I mean, can I talk to you about California? I'm fairly confident that on behalf of the client, you can talk to me about that. Well, there's evidence in the record that there were servers up and running at some point in time in California. Yes, and that was the... Maybe you moved them to Canada. Right, and keep in mind, Judge Clevens... So why isn't that next case? I'm sorry? Well, your argument is that there were no servers in the United States, and therefore everything was performed offshore. At the time of the hearing, that was the case. I'm just saying there's substantial evidence in the record that there were servers in California. Why isn't it on this point in the next case? Right, and the answer to that is, yes, there was one server in California. The ALJ so found, we don't dispute that. That mere finding, which is all that the ITC and Broadcom rely upon, doesn't go so far as to say what happens from the data from that server once it leaves that server. That server is exclusive to RIM, the same Canadian company in the NTP case. Their servers are located in Canada. So that step is not practiced in the United States, and that's why it's not next case, Judge Clevenger. I'm already into my rebuttal time. One quick question, if you don't mind. This is on the 346 issue. Sure. What's the strongest piece of evidence you have in support of your argument that the invention belonged to Magellan because it was related to or useful to their business? What's your single strongest piece of evidence? If I had to be asked for a single strongest piece of evidence, it's either the 346 patent itself or it's the fact that Magellan was in the GPS business because it's the linkage between those two. It's not the article. You've raised that late. That article certainly does show that as well. I didn't see any evidence that that was ever raised below. You've got a fairly good argument in the form of the big article, and the article says, gee whiz, this is stuff, and the patent was an improvement over that, and that belonged to Magellan. But that fact shows up in your reply brief. It does. And I saw no evidence that that fact had ever been submitted into the mix of facts on this inventorship issue. Well, it was actually cited in the patent, and it certainly was in the record. I can stand here and say that right now. That's assuming that the ALJ will find things on it, or AJ will find things on it, his or her own. It just struck me that that was a little late in the game to be leaning heavily on it, and you didn't cite that as your best piece of evidence. No, I think this is really a simple syllogism. The employment agreement with Magellan said all inventions related to... And the problem is that there is evidence in the record upon which the commission relied of the inaction, if you will, of Magellan in asserting any interest. Well, how could they think it was related to or of benefit to them if it never did anything? Well, again, that's a subjective standard, and the Lucent case from this court, which we've cited in both our opening and reply briefs, makes clear that the owner... Subjective? I'm sorry? Subjective. Why isn't the failure to act an objective fact, yes or no? Well, it's an objective fact, absolutely, but the question is, did this invention... The threshold question was, did this invention relate to Magellan's business? And the answer is Magellan was in the GPS business. This was a GPS patent, and they sued Magellan's competitors, MITAC, MEO, and ETAC. I only ask the question because I want to dispose of the significance of the late-found article. Just following up on your comment that these briefs have claimed confidentiality even for the related to language in the contract, that seems to be absurd. I don't understand why parties file briefs like that. Take that under advisement, Judge Dyck. Thank you. If the court has any further questions, I'll return on rebuttal. Thank you. Mr. Valencia? Good afternoon, Your Honors, and may it please the court. There are two key points on this divided infringement issue. The first key point is that CERF bills its instant-fix system as an end-to-end system, one end referring to its server and the other end referring to the chip and the software operating in the GPS receiver.  it can be used as an end-to-end system and it controls every aspect of the instant-fix system so that its customers and end-users will have to rely on it. But they do have to turn it on, right? They do have to turn it on, Your Honor. The question is whether that makes it a case of divided infringement. Your Honor, it does not make it. There's actually no claim step directed to turning on the... The last claim step can't take place unless they turn it on, right? Right, and that's the distinction with the Muni Auction case. The Muni Auction case, the first step in the claim method there was inputting a bid and the user had to do this on its own. There's no step directed to the actions of end-user here. The steps are directed to the actions of CERF servers... Well, how do you process the satellite signals that have been received from the receiver using the ephemeris, etc.? How do you perform that step unless the device is turned on? You can't, Your Honor. I think that's Judge Dyke's point. Right, and it's our view that the Muni Auction case is different for the very reason that Judge Dyke asked a moment ago that whether this is a different case altogether and whether this is not the traditional divided infringement case. And we think that it's not. We think that there's a clear distinction here and it's in the claim language and the boundary you can draw is in the claim language. So the steps of the 651, for example, are receiving... Take your adversary's argument on, if useful to me at least, on a sequential step-by-step basis. Before you get to the end-user who has to switch the machine on, your adversary is saying that the customer, the middleman, as we've described it, has to do something. If the middleman doesn't do something, end of game. So tell me exactly what the middleman has to do in order for the GPS receiver to work once I turn it on, I'm the consumer. The middleman has to forward these extended ephemeris files to its customers. And is that something that just happens automatically if the middleman has his machine turned on? Is there an elective? Could, for example, if the middleman got into a contract dispute and was served and had a fight, I don't like you anymore, could the middleman turn off his switch so that Clevenger, the owner of the GPS, would turn it on and nothing would happen? There's no evidence in the record on that point, Your Honor, but I would imagine that if the customer's unhappy with its service, it could certainly terminate unless it's bound by contract. But I think the distinction here is... for purposes of whether there's divided infringement, then the consumer, who simply has, as we've described it, flicked the switch and turned it off. Again, going back to the claim language, the receiving, the communication, and the processing of the ephemeris all occur, surf servers, surf software, and surf chips. There is no step directed to the... We appreciate that. So let me ask you this question. I think it will help me understand what Judge Dyke was looking for is where we draw the line. How much more would have to happen in this processing step at the end game in order for you to agree that there'd be divided infringement? If there was a step in the claim that said forwarding extended ephemeris files to end user, in addition already to the receiving and the communication step, in that case we might have a different case. That may be divided infringement. If there was a step that said enable processing in GPS receiver performed by the end user, for example, we might have a different case there as well. What you want us to do is to construe, if I understand what you're saying, you want us to construe these claims as saying when somebody has the machines, the server, and the GPS thing turned on, these are the steps that will be followed. That's correct. I think it's also useful to understand that CERF maintains control. That's the whole point of this instant fix system. It sets it up, it designs a system, it tests the system, it infringes this patent, and then it provides these chips and software and continues to send these chips and software data to complete the act of infringement. It's not that in the context of the claim language, this is all actions that are being performed by CERF. The pushing a button or activating the receiver is no more part of a claim than, say, purchasing the device or taking the device out of the packaging. Those steps aren't in the claim as well. Since the claim language is only directed to CERF's activities, CERF infringes. Now on the 346 patent, the standing issue... I have trouble with that in the sense that I'm not seeing where the settlement of this trade secret case involved a concession by Magellan that it didn't have ownership rights. It gave a license to the technology. Why is that a concession that they didn't have ownership rights? Well, Your Honor, this touches on some CBI that may be Magellan's, but I'll try to address your question in more general terms. But you have to look at the entirety of the evidence here. You have Abraham working for Magellan. He conceives of this invention. This is undisputed. No party disputes this. He tells other co-employees at Magellan about this invention. Then he leaves Magellan to join Global Locate. Magellan then sues Global Locate and Abraham for a trade secret misappropriation. Presumably Magellan's looking for evidence of stolen trade secrets, i.e., the 346 invention. They're presented with documentation that's dated. Dated when Abraham was an employee of Magellan showing conception of the invention. And what do they do? They settle it in a manner in which they say Global Locate can continue to use. But Your Honor, that answered my question. Why is that inconsistent with ownership? That's what people who own things do. They license other people to do it. Again, that touches... If you look at the document, Your Honor, and if you look at our brief, we actually have an argument based on the language of the settlement itself. The point there being that if you own something and you just find out they sued for trade secret misappropriation, that was their injury that they were complaining about. Then arguably they found a trade secret that was misappropriated and then they granted a license. They learned about this invention. That seems to be conceived. But why is the action that they took in settling the case and giving a license inconsistent with a claim of ownership? It's not just that act. Sure, they could have granted a license if they owned it, but we're left with the evidence on the record. We can say that it granted a license. We can say that they allowed Global Locate to pursue this technology. They could have asserted a claim of ownership. They knew this patent was involved in an investigation at the ITC. They didn't take any action. You're saying because somebody doesn't intervene in the ITC proceeding, that's evidence that they didn't own the patent? Not solely, Your Honor. Again, we have to look at the entirety of the evidence. Here, Magellan has never acted like a co-owner. If you go back to our brief and look at the argument that's made on the language of the settlement, I see my time is up. Can I finish answering the question? If you go back to our brief, there's an argument laid out in terms of the settlement agreement. You can see when you look at that that their actions are entirely inconsistent with what would imagine an owner of something to do. You think it was Global was preserving its right to continue doing what it could do Your argument is it's a toss-up. There are two ways of reading the settlement agreement. You can read it to suggest that either party was the owner. No, my argument more specifically goes to the terms of the settlement. And the fact that it took this it laid out the 346 technology among other things. If you read that in connection with all of Magellan's other conduct or lack thereof, it's pretty clear that they didn't consider this invention related to their business. And we're ultimately trying to look at what related to means here. And that's all we have. Thank you, Mr. Lee. May it please the Court, my name is Bill Lee and together with my partner Todd Zubel, I represent Global Locate and Broadcom. In my time, let me make four points quickly. On the extra-territorial issue, Mr. Castaneda is correct that a fact was raised below and the Commission addressed it at A26602. Here is what happened. There was a 30B6 deposition witness, Peter Kuykendall, who testified at the locations of the servers.  We offered that evidence at trial. Mr. Kuykendall never changed his testimony and that was conceded at trial. Cerf called another witness, Mr. Panda, who was going to contradict Mr. Kuykendall's testimony and suggest that perhaps there was a server outside the United States as well. On cross-examination in the record at A13028, Mr. Panda conceded that he had no personal knowledge of this at all. His knowledge was solely based on what Mr. Kuykendall had told him. On that record, ALJ and then the Commission affirmed it. They basically made a credibility determination that the person who gave uncontradicted 30B6 testimony, never revised, was to be believed and the person who came in later and testified on a hearsay basis relying solely upon that person was not. And they made a factual finding that's supported by substantial evidence. A second issue on the 346 patent, to go to your question, Judge Dyke, I agree with Mr. Valencia that you have to look at the entirety of what occurred. And the entirety of what occurred included the fact that Mr. Abraham, at the time he conceived of his invention in 1999, sent an email to other people at Magellan who got the email with a long... People with whom he formed this new company. They did not go. There's evidence there were people he was considering having joined, but not so. And then when the lawsuit was... There's no evidence that somebody in a responsible position was aware of that email at the time, right? Well, Your Honor, I ask you if the two people were in a responsible position. And if you take the fact that you have that 1999 email, the lawsuit, the fact that that email and all his conception documents, including the PowerPoint that's in the record today, were produced to Magellan, you then have the settlement. And I think the settlement is maybe subject to what Judge Clevenger said, to different interpretations, but it's more than just a license. And the reason you know it's more than just a license is it's followed by the letter to the customer. And the letter to the customer, which is designated confidential because Magellan asked that it be treated in that manner, said he did not take anything from our GPS project. So you have the combination of a full disclosure, the combination of a settlement, a settlement that explicitly allows us to proceed in the area that we want to proceed, and then a letter to a customer that said he didn't take anything from us, from our project. The issue of ownership is a legal issue. Where is the letter? The letter is at A13516. The issue of ownership is, to be sure, a legal issue, but here it's based upon a contract, a contract that has related to. Related to is, as we've suggested, and I don't think there's a lot of disagreement, ambiguous, or at least subject to different interpretations. And the different interpretations of the contract required the court to get into the extrinsic evidence. That extrinsic evidence, which required them to weigh the credibility of people, including people called adversely, is subject to the substantial evidence standard, and we think the substantial evidence supports the finding. Third issue, on this divided infringement issue, I'll just make two quick points. Who has the burden on the standing issue? We do. We have the burden of persuasion ultimately. There is a burden of production that is nothing more than the normal burden of production and a liberty-lobby type burden of production. And the ALJ considered both. But ultimately we had the burden of persuasion and the ALJ and the Commission found that we had carried it and I think the record has substantial evidence to support that determination. But the problem is it seems to rest so heavily on Magellan's conduct as opposed to the interpretation of the language of the agreement and the determination of what the business was. Your Honor, I think it's more than that. It relies upon the contract. It relies upon Mr. Abraham's testimony, who testified twice in this proceeding, once as part of our affirmative case and then called on rebuttal specifically to address this issue, and that was a representation to the ALJ. And we have cited the entirety of that testimony where there was nothing to indicate that the work he was doing was related to their business. And then you have the email. He testified there was nothing that he did that was related to Magellan's? No, he testified that he testified to facts rather than conclusions. He testified that he in particular was involved in land surveying applications and that there were GPS applications for the land surveying. He testified that he did this work on his own time. But that's nothing to do with it, right? It does, Your Honor, because the fact that he did it I mean, there's no question that he conceived of the 346, right? There's no question. And there's no question 346 had anything to do with land, right? Correct. So maybe he was cooking up something better than land at home. It has to be what he was doing. The answer is yes, because what he was cooking up, to use Your Honor's term, is he was looking for something that could be used in consumer applications. GPS existed before this series of patents was, the series of inventions made in these patents were created. The fact that he was doing it at home has nothing to do with it, right? That's probably, in most of these cases, where an employee is claiming an invention that he invented while he was working at the company, probably normally people do it on their own time. But that doesn't mean that it's not transferred by the employment agreement. May I answer the question? Your Honor, actually, I suggest that it does. Now, it's not direct evidence, but it is circumstantial evidence. And if an employee who is working on land surveying applications that have some GPS components and has an idea and is working it at home on the weekends on his own time, that is a suggestion that he didn't think it was related. And then if you take the conduct of all the parties, you have Magellan, you have him, the entirety of the evidence that was before the commission was substantial evidence that they were not related and that there was no ownership on the part of Magellan. Thank you, Your Honor. Mr. Castanis, rebuttal, two minutes. Let me start with the divided infringement issue. Muni Auction Judge Clevenger holds explicitly and I quote, that Thompson controls access to its system and instructs bidders on its use is not sufficient to incur liability for direct infringement. It's hard for me to see that this is a different case. Well, what about the ITC's argument that what this really is is a method to be used when the machines are turned off. And they say turning on the machine is not one of the steps, it's just describing a method for machines that are in use. Excuse me a second. Would you like to bring this up with me? I think that argument doesn't work because of the last steps of each of these patent claims. You look at claim one of the 651, it requires processing satellite signals received at the mobile GPS receiver using the ephemera. Something actually has to happen. It's not just a turning on of the system. No, but they're saying what it claims is what happens in systems that are already on. It doesn't claim a specific step of turning it on, they're saying it's a description of a method for use with turned on machines. What's the answer to that? Well, I think that's probably true, but I'm not sure that it gets them to where they need to be here. Because the point is, and you can look by the way at our reply brief at pages 31 to 32 and the citations that are located there and you'll see that these units do operate even if the extended ephemeris is not downloaded into them. So this is just data that allows for the prediction of future satellite locations. If you don't have it, then the device will still operate. It may not be as accurate, but it will still operate. Which step in claim one won't work if the middle man is turned on and the end user is turned on? I'm sorry, again, Your Honor? Which step in claim one won't work if the middle man has his machine turned on and activated and the end user is turned on? Well, the step is the process... If the satellite ephemeris received at a first location in that circumstance. Both the middle man and the end user are turned on. Okay. Is receiving satellite ephemeris at a first location met? Does that happen? That would be in the surf servers located abroad, so that would happen. That happens, right. How about communicating the ephemeris to the mobile GPS reader at the second location? If everything is turned on, that happens, right? Well, I want to make sure that we're communicating on the question of what you mean by turned on because you earlier described that as just being flipping the switch. Just active. But remember here that it's not just being electrically operated. It's that the customer has to make the decision to send this extended ephemeris, this calculated data, to the end user and the end user has to take the affirmative steps to go out and get that data. Those are the things that won't work. So it's not just a matter of turning on either the server or the end units. Yeah, but I think that their argument encompasses those things. What they're saying is that this is a method that is capable of use when you have turned on machines connected in such and such a way and sending data in such and such a way. They're saying that's the way you should construe these claims, not that it requires that the customer turn on the server or that the GPS be turned on or that they be connected in such a way. They're saying that's part of the background. This is a method to be used in a situation in which those things have already been done as opposed to a method that describes achieving that situation. Then I think, Your Honor, you have to look at the communicating and processing steps and look at those verb forms and think of CERF as the actor. Is CERF communicating the satellite ephemeris to a mobile GPS receiver? Maybe it is. Is it processing the satellite signals received at the mobile receiver? Maybe it is and maybe it isn't. What happens if it's not? It doesn't work, right? It doesn't work. Remember, those are the customer servers there at the communicating and transmitting steps. That's not CERF, again. That's the important part. Who is the actor doing the communicating? That actor is not CERF. Who is the mobile GPS receiver at the second location? Joe, GPS? Me or Judge Kledinger. Where is the middle man? The middle man is the person who is doing the communicating. Communicating the satellite ephemeris to a mobile GPS receiver at a second location. In fact, the receiving step of 651 is also being done at CERF's customer servers. We are not the actor and we are not the actor on the processing step. Other points on rebuttal, but I think I've well extended my time here, so I thank the Court for its time. Thank you all. The case is submitted. All rise. The Honorable is adjourned.